IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-506

Filed: 7 July 2020

New Hanover County, No. 15 CVS 4534

LORETTA NOBEL, Plaintiff,

v.

FOXMOOR GROUP, LLC, MARK GRIFFIS, DAVE ROBERTSON, Defendants.

Appeal by Defendant Robertson from judgment entered 30 November 2018 by Judge Charles H. Henry in New Hanover County Superior Court. Heard in the Court of Appeals 5 February 2020.

*Mason & Mason, by Amanda B. Mason and Sarah C. Thomas, for plaintiff-appellee.*

*The Lea Schultz Law Firm, P.C., by James W. Lea, III, for defendant-appellant.*

MURPHY, Judge.

A contract under seal is subject to a ten-year statute of limitations for its breach, as opposed to a three-year statute of limitations for a contract not under seal. A promissory note stating it shall take effect as a sealed instrument, with no seal following the principal's signature, may be deemed "sealed" where evidence demonstrates that the parties intended the promissory note to be a sealed instrument. To be entitled to judgment on a claim that a party has violated the Unfair and Deceptive Trade Practices Act ("the UDTPA"), a plaintiff must establish, among other things, that the defendant's action in question was in or affecting commerce, namely business activities. However, soliciting funds to build up capital

is not a business activity, even when it is unfair or deceptive, and is therefore not subject to the UDTPA.

## **BACKGROUND**

This case arises from Plaintiff Loretta Nobel's ("Nobel") loan to Foxmoor Group, LLC, which did not repay the loan and subsequently dissolved. Mark Griffis ("Griffis") and Dave Robertson ("Robertson") were the sole members and managers of Foxmoor Group, LLC (collectively "Defendants"), and actively encouraged Nobel to invest in the company.[1]

Nobel met Griffis and Robertson in 2003 through social and charitable functions in which all three participated. Nobel contributed articles to a lifestyle magazine that Robertson co-owned and managed, and Griffis and Robertson assisted Nobel with custody litigation expenses and medical bills. After facing financial difficulties and divorcing her spouse, Nobel moved from North Carolina to Ecuador with her grandson, although she later returned to North Carolina. Griffis and Robertson knew about Nobel's difficulties.

Griffis founded Foxmoor Group, LLC in 2010 while Nobel was in Ecuador. On 9 December 2011, the Secretary of State sent "Notice of Grounds for Administrative Dissolution" to Foxmoor Group, LLC due to the company's failure to file an annual

---

[1] Only Robertson filed a timely notice of appeal, and, to the extent the other two Defendants intended to appeal the trial court's judgment, their appeal of this matter was dismissed by our *Order* on 31 January 2020.

report. After the company was dissolved due to its failure to file an annual report in 2011, Robertson helped Griffis obtain Foxmoor Group, LLC's reinstatement. Foxmoor Group, LLC obtained reinstatement in 2012. Griffis and Robertson told Nobel throughout this time period the business was performing very well and asked Nobel to provide financial capital to Foxmoor Group, LLC.

Despite the 9 December 2011 notice of pending dissolution from the Secretary of State, Griffis advised Nobel in a 12 December 2011 email of an investment opportunity in the company and proposed potential investment amounts of $75,000.00 or $150,000.00. Nobel responded that she could only invest $25,000.00 at that time, and after Griffis agreed that amount was acceptable, she subsequently sent a $25,000.00 check to Griffis on 9 January 2012 for "a buy in of 4 years and a renewal of [$]10,000[.00] for an additional 4 years." Defendants made three payments to Nobel toward repaying the $25,000.00 investment on 1 March 2012, 1 April 2012, and 1 May 2012.

After moving back to North Carolina in February of 2012, and in response to Griffis's and Robertson's continued representations concerning the strength and growth of the company, and a corresponding financial opportunity for her, Nobel loaned an additional $75,000.00 to Foxmoor Group, LLC. To convince Nobel to make the loan, Griffis also offered her four years of health insurance as an employee of Foxmoor Group, LLC, and included that promise in an additional written agreement.

Griffis and Nobel signed the 24 May 2012 additional written agreement. The additional written agreement also provided that the contract would renew "at a wage of $3[,]500[.00] per month for as long as such time [Nobel] continues in her desire for employment." On 24 May 2012, a promissory note ("the promissory note") was executed for repayment of Nobel's $75,000.00 loan. Robertson prepared the promissory note, and Griffis signed the promissory note as "CEO" of Foxmoor Group, LLC. The promissory note contained the language "[t]his note shall take effect as a sealed instrument and is made and executed under, and is in all respects governed by, the laws of: [] the State of North Carolina." However, the promissory note did not contain a seal following Griffis's signature. According to the terms of the promissory note, in exchange for the $75,000.00 "value received" from Nobel, Foxmoor Group, LLC would make monthly payments of $3,500.00 to Nobel from 1 July 2012 to 1 July 2016. Nobel was initially hesitant to make the loan. On 24 May 2012, the same day the promissory note and additional written agreement were executed, Defendants cashed and deposited the $75,000.00 check.

Nobel later received a $7,000.00 check, dated 10 June 2012, from Foxmoor Group, LLC, executed by Robertson. Only $3,500.00 was for repayment of the promissory note, and the other half of the check was a fourth installment payment toward her prior investment of $25,000.00. After the 10 June 2012 payment, Nobel received no further payments from Defendants. Additionally, she was never covered

by any health insurance policy in connection with Foxmoor Group, LLC. When she contacted Griffis asking why she was not receiving payments, he responded that if she tried to get the money owed to her, he would declare bankruptcy, and she would lose everything. Instead of repaying Nobel for her $25,000.00 investment, and $75,000.00 loan under the terms of the promissory note, Griffis and Robertson used their position in Foxmoor Group, LLC to access corporate funds and use those funds for personal use.

After obtaining reinstatement in 2012, Foxmoor Group, LLC did not file an annual report in 2013, and was dissolved on 4 March 2014.

In December 2015, Nobel sued Defendants for breach of contract, piercing the corporate veil, fraudulent misrepresentation, money owed, and unfair and deceptive trade practices. Defendants argued that the promissory note was not a sealed instrument, meaning the statute of limitations had expired, and denied Nobel's allegations. The trial court, sitting without a jury, found that the promissory note was an instrument under seal, determined Foxmoor Group, LLC was an alter ego of Griffis and Robertson, meaning the instrumentality rule allowed for the piercing of the corporate veil, and held Defendants liable for breach of contract, fraud in the inducement, and unfair and deceptive trade practices.

## ANALYSIS

### A. Statute of Limitations and Breach of Contract

The first issue on appeal is whether the trial court erred in finding and concluding the promissory note was an instrument under seal. Nobel's breach of contract cause of action regarding the $25,000.00 investment was barred by the statute of limitations. N.C.G.S. § 1-52(1) (2019). If the 24 May 2012 promissory note, with monthly payments beginning 1 July 2012, was not deemed to be a sealed instrument, Nobel's December 2015 breach of contract cause of action regarding the $75,000.00 loan would likewise be barred by the statute of limitations. *Miller v. Randolph*, 124 N.C. App. 779, 781, 478 S.E.2d 668, 670 (1996) ("[N.C.G.S. § 1-52(1)] begins to run when the claim accrues; for a breach of contract action, the claim accrues upon breach."). The statute of limitations for actions "[u]pon a sealed instrument . . . against the principal thereto" is ten years. N.C.G.S. § 1-47(2) (2019). In contrast, the statute of limitations for actions upon an unsealed contract or liability arising out of an unsealed contract is three years. N.C.G.S. § 1-52(1) (2019). Here, the promissory note includes language directly preceding the principal's signature that states: "[t]his note shall take effect as a sealed instrument . . . [,]" but does not include a seal following the principal's signature. Since the instrument lacks a seal, Robertson argues it is not a sealed instrument and does not fall under the ten-year statute of limitations.

Robertson does not contest any of the trial court's findings of fact on the issue of whether the promissory note was, in fact, sealed. Instead, he argues the trial court

erred as a matter of law in concluding the instrument was sealed and that, therefore, Nobel's claims related to the promissory note fall under the three-year statute of limitations. Conclusion of Law 2 concludes the promissory note is a sealed instrument and the ten-year statutory period applies as to Nobel's breach of contract claim.

Our Supreme Court has advised, "the determination of whether an instrument is a sealed instrument, commonly referred to as a specialty, is a question for the court." *Square D Co. v. C.J. Kern Contractors, Inc.*, 314 N.C. 423, 426, 334 S.E.2d 63, 65 (1985) (citing *Security Nat'l Bank v. Educator's Mut. Life Ins. Co.*, 265 N.C. 86, 143 S.E.2d 270 (1965)). However, we have treated the issue of the parties' intention to seal the document as an issue of fact: "We are constrained to hold that a material issue of fact remains as to the intent of the parties to enter into a sealed instrument, and accordingly [N.C.]G.S. [§] 1-47(2) is not necessarily applicable to the present action." *First Citizens Bank & Trust Co. v. Martin*, 44 N.C. App. 261, 267, 261 S.E.2d 145, 150 (1979) (holding "the trial court erred in concluding as a matter of law that the statute of limitations did not bar [the] plaintiff's action against [the] defendant . . . , and summary judgment against [the defendant] was improvidently granted").

In *Square D Co.*, the question for the court was "whether [a] corporate seal transforms the party's contract into a specialty[.]" *Square D Co.*, 314 N.C. at 428, 334 S.E.2d at 66. Our Supreme Court held the determinative factor in reaching such a

decision "is *whether the body of the contract contains any language that indicates that the parties intended that the instrument be a specialty* or whether extrinsic evidence would demonstrate such an intention." *Id.* (emphasis added). "[A]bsent any evidence . . . indicat[ing] that the parties intended that the contract was to be a sealed instrument, . . . the contract in this case was not a specialty and [] the ten-year period of limitation contained within [N.C.]G.S. [§] 1-47(2) would be inapplicable to [the] plaintiff's action." *Id.*

Although the instrument here does not contain a seal—corporate or otherwise—there is convincing evidence within the four corners of the promissory note that the parties intended the instrument to be sealed, which allows it to be treated as such. Our holding in *First Citizens Bank & Trust Co. v. Martin* supports the premise that the parties' intent to file the instrument under seal is relevant to the determination of whether the document was, in fact, filed under seal. *First Citizens Bank & Trust Co.*, 44 N.C. App. at 267, 261 S.E.2d at 150. The trial court did not make such a finding of fact here, but still noted the language "this note shall take effect as a sealed instrument" in the promissory note in Finding of Fact 16.

Based on our caselaw, an instrument will be deemed "sealed" where it appears on its face or through extrinsic evidence that the parties intended it to be a sealed instrument. In rare instances, as here, this clearly-stated intent will result in an instrument being treated as though it was filed under seal even where the principal(s)

to the contract do not include a seal after their name. The trial court concluded that the promissory note was to be "strictly construed against [Robertson and Griffis]" because it was "generated and drafted by [Robertson] and signed by [Griffis] as a sealed contract." Additionally, "[Robertson and Griffis] had the best opportunity to protect their own interests thus any doubt as to its interpretation will be resolved against them." Each of these sub-conclusions is supported by unchallenged findings of fact, and the trial court's conclusion that the ten-year statute of limitations applies to the promissory note is affirmed.[2]

## B. Instrumentality Rule

Robertson argues that "the trial court erred in ruling that the individual Defendants were the alter-egos of Defendant Foxmoor," and the corporate veil should not have been pierced.

"In North Carolina, what has been commonly referred to as the 'instrumentality rule,' forms the basis for disregarding the corporate entity or 'piercing the corporate veil.'" *Glenn v. Wagner*, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985). The corporate form may be disregarded, and the corporation and the shareholder treated as the same entity, if "the corporation is so operated that it is a

---

[2] Robertson also argues, in Section V of his *Appellant's Brief*, that the trial court "erred as a matter of law by entering judgment against [him] for breach of contract[.]" This argument is two sentences long: the first sets out the two elements of a breach of contract claim under North Carolina law, and the second states, "[t]he trial court erred in concluding that [Robertson] executed a sealed promissory note with [Nobel] . . . ." Given our conclusion that the promissory note was filed under seal, we hold the trial court did not err in entering judgment against Robertson for breach of contract.

mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for

his activities in violation of the declared public policy or statute of the State[.]" *Estate*

*of Hurst ex rel. Cherry v. Moorehead I, LLC*, 228 N.C. App. 571, 577, 748 S.E.2d 568,

573–74 (2013). There are three elements of a successful "instrumentality rule" claim:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Glenn*, 313 N.C. at 454-55, 329 S.E.2d at 330.

Here, in Finding of Fact 28, the trial court made the following unchallenged

finding:

> The individual defendants had complete domination over the finances, policy making and business practices of Foxmoor with respect to the events which injured [Nobel] so that Foxmoor had at the time no existence of its own. Griffis and Robertson used their control over the company to siphon and drain the corporation of funds for personal use so that it could not satisfy its legal obligations under the promissory note delivered to the plaintiff.

- 10 -

As this finding of fact is not challenged by Robertson, it is binding on appeal. *See Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). This finding independently supports the trial court's Conclusion of Law 5 that Nobel proved all three elements of an "instrumentality rule" claim—indeed, the trial court used the exact language from *Glenn* in entering this finding of fact. *See Glenn*, 313 N.C. at 454-55, 329 S.E.2d at 330.

Conclusion of Law 5 is supported by Finding of Fact 28, which is supported by competent evidence. The trial court heard the following testimony: that Griffis and Robertson were the only members of Foxmoor Group, LLC; that both Griffis and Robertson told Nobel that business was thriving; that Robertson prepared the promissory note; that Robertson signed the 10 June 2012 check from Foxmoor, LLC toward repaying the promissory note; and, that Nobel never received further payment, other than the 10 June 2012 check, toward the promissory note. Although Robertson points us to testimony to the contrary, it is the factfinder's duty to determine the credibility of testimony. *GEA, Inc. v. Luxury Auctions Marketing, Inc.*, 259 N.C. App. 443, 455, 817 S.E.2d 422, 432 (2018); *see also Smithwick v. Frame*, 62 N.C. App. 387, 392, 303 S.E.2d 217, 221 (1983) (noting that "the trial judge, sitting without a jury, has discretion as finder of fact with respect to the weight and credibility that attaches to the evidence"). "The trial court must itself determine what pertinent facts are actually established by the evidence before it, and it is not for an

appellate court to determine *de novo* the weight and credibility to be given to evidence disclosed by the record on appeal." *Coble v. Coble*, 300 N.C. 708, 712-13, 268 S.E.2d 185, 189 (1980). The trial court's conclusion that the instrumentality rule applies is affirmed.

## C. False Representation/Fraud

Robertson next argues "the trial court erred as a matter of law in concluding the Defendants made false representations to induce [Nobel] to invest in Foxmoor." Although he does not use the word "fraud" here, Robertson's argument is that the trial court erred in concluding he committed fraud in the inducement. In relevant part, the trial court concluded:

> 7.     The [D]efendants made false representations to induce [Nobel] to loan the [D]efendants the sum of $75,000[.00]. [Nobel] did, in fact, rely on this misrepresentation in reaching her decision to loan this money. The [D]efendants demonstrated no intention on providing health insurance to [Nobel] or repaying fully their obligation established by the promissory note.

> 8.     [Nobel] has suffered a financial injury, and the [D]efendants' conduct was the proximate cause of that injury.

These two conclusions of law do not include a specific monetary award. However, Conclusion of Law 10 is an award that corresponds with the breach of contract, fraud, and UDTPA violation claims. Specifically, Conclusion of Law 10 states: "[Nobel] is to recover as damages from the [D]efendants for breach of contract the sum of $164,500[.00]. That same amount is also the amount of damages for the

unfair and deceptive trade practices. Pursuant to N.C.G.S. § 75-16 those damages are trebled." In light of our holdings that (1) the promissory note was not erroneously determined to be a sealed instrument, and our affirming the trial court's conclusion that Defendants breached their contract with Nobel, and (2) the corporate veil could be pierced as to Robertson, we need not address the fraud issue because vacating the trial court's conclusion regarding fraud would not make an impact on the trial court's ultimate award of monetary damages.

### D. Unfair and Deceptive Trade Practices Act

To be entitled to judgment on a claim that a party has violated the UDTPA, a plaintiff must have established that: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). In challenging the trial court's conclusion that Robertson violated the UDTPA, he does not take issue with elements one or three; instead, he argues the acts in question were not "in or affecting commerce" and therefore do not fall within the protections of the UDTPA. N.C.G.S. § 75-1.1 (2019). On this issue, the trial court concluded that "[t]he [D]efendants['] conduct involved a regular business activity of the [D]efendants that affected commerce."

"For [the] purposes of [the UDTPA], 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a

member of a learned profession." N.C.G.S. § 75-1.1(b) (2019). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). However, "any unfair or deceptive practices occurring in the conduct of extraordinary events of, or solely related to the internal operations of, a business will not give rise to a claim under the [UDTPA]." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010).

In *HAJMM Co.*, our Supreme Court addressed a situation where a corporate defendant had issued a corporate plaintiff a number of "fund certificates," or, "in essence, corporate securities." *HAJMM Co.*, 328 N.C. at 593, 403 S.E.2d at 493. The defendant's "bylaws provide[d] that the purpose of issuing the certificates was to 'build up . . . capital.'" *Id.* Our Supreme Court held that the sale of such instruments was not a business activity, but an "extraordinary event done for the purpose of raising capital in order that the enterprise can either be organized for the purpose of conducting its business activities or, if already a going concern, to enable it to continue its business activities." *Id.* at 594, 403 S.E.2d at 493. Our Supreme Court reasoned "[s]ecurities transactions are related to the creation, transfer, or retirement of capital. Unlike regular purchase and sale of goods, or whatever else the enterprise

was organized to do, they are not 'business activities' as that term is used in the [UDTPA]." *Id.* Therefore, "[t]hey are not . . . 'in or affecting commerce,' even under a reasonably broad interpretation of the legislative intent underlying these terms." *Id.*

Our Supreme Court affirmed this interpretation of the UDTPA in *White*, and described the central holding of *HAJMM Co.* as standing for the proposition that "any unfair or deceptive practices occurring in the conduct of extraordinary events of, or solely related to the internal operations of, a business will not give rise to a claim under the [UDTPA]." *White*, 364 N.C. at 52, 691 S.E.2d at 679. Further, our Supreme Court reasoned that the General Assembly's intent in passing the UDTPA was to regulate "two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *Id.* "As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the [UDTPA]." *Id.* at 53, 691 S.E.2d at 680.

Here, Robertson's unfair or deceptive practices all relate to inducing an investment from Nobel for the purpose of funding Foxmoor Group, LLC, i.e. providing a loan for the purpose of giving the business additional capital with which to operate. Based on our Supreme Court's interpretation of the UDTPA, soliciting funds to build up capital, as occurred here, was an extraordinary act and not a business activity of Foxmoor Group, LLC. It is not a "regular purchase and sale of goods, or whatever

else the enterprise was organized to do[.]" *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493. Instead, the alleged unfair or deceptive act here is almost directly equivalent to the sale of fund certificates by the defendant in *HAJMM Co.*, as the promissory note signed by Griffis is a "capital-raising device[]." 328 N.C. at 595, 403 S.E.2d at 493. In following our binding precedent from *HAJMM Co.* and *White*, we conclude the trial court erred as a matter of law in concluding Robertson's acts were "in or affecting commerce," and therefore subject to the UDTPA. The trial court's conclusions to the contrary—and the related monetary award and trebling of the same—are reversed.[3]

## **CONCLUSION**

The trial court did not err in concluding the promissory note was an instrument under seal, Nobel could pierce the corporate veil, and Robertson was liable for breach of contract as to the promissory note. However, Defendants' soliciting funds to raise capital were not a business activity, and the trial court erred in concluding that the proven acts violated the UDTPA.

AFFIRMED IN PART; REVERSED IN PART.

Judge ZACHARY concurs.

Judge ARROWOOD concurs in part and dissents in part in a separate opinion.

---

[3] As the appeals of Foxmoor Group, LLC and Griffis were dismissed, the judgments against them remain undisturbed.

ARROWOOD, Judge, concurring in part and dissenting in part.

I concur fully with that portion of the opinion in so far as it affirms the trial court's holding that the promissory note was an instrument under seal, and plaintiff's claims are thus not barred by the statute of limitations. I also concur with that portion of the opinion concerning defendant's liability for breach of contract and fraud.

However for the reasons set forth below, I dissent from that portion of the majority's opinion which reverses the trial court's award of damages on plaintiff's claim under the Unfair and Deceptive Trade Practices Act.

## I.     Discussion

Pursuant to the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2019). The majority correctly notes that to be entitled to judgment on a claim that a party has violated the UDTPA, a plaintiff must establish that: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citing *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 461, 400 S.E.2d 476, 482 (1991)). The Act clarifies that "[f]or purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered

by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). "Business activities" refers to "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). The Act thus does not cover all wrongs in a business setting: it does not cover ordinary employer-employee disputes, *Buie v. Daniel International*, 56 N.C. App. 445, 289 S.E.2d 118 (1982), securities transactions, *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 333 S.E.2d 236 (1985), or those wrongs committed by and against partners within the same company, where the wrongs committed only affected that company and or its co-owners, *White v. Thompson*, 364 N.C. 47, 691 S.E.2d 676 (2010).

For instance, in *White*, three partners formed Ace Fabrication and Welding ("ACE") to provide specialty construction and fabrication services for a plant operated by Smithfield Packing Company, Inc. ("Smithfield"). *Id.* at 48, 691 S.E.2d at 677. The partners agreed that they would divide up the contracts ACE won among themselves and receive hourly wages from ACE for the hours each of them actually worked. *Id.* One of the partners, the defendant, later violated this agreement by hiring several people not affiliated with ACE to help him perform certain Smithfield jobs that had been awarded to ACE. In addition, he formed a new company, called PAL, and used it to compete for Smithfield jobs. *Id.* at 49-50, 691 S.E.2d at 677-78.

As a result of the defendant's actions, ACE ultimately went out of business. *Id.* at 50, 691 S.E.2d at 678. The defendant's former business partners sued him for unfair and deceptive trade practices, among other claims. *Id.*

Our Supreme Court held that "[b]ecause [the] defendant . . . unfairly and deceptively interacted only with his partners, his conduct occurred completely within the ACE partnership and entirely outside the purview of the [UDTPA]." *Id.* at 54, 691 S.E.2d at 680. In reaching its decision, our Supreme Court emphasized that the UDTPA "is not focused on the internal conduct of individuals within a single market participant, that is, within a single business[,]" but rather "the General Assembly intended the Act's provisions to apply to interactions between market participants." *White*, 364 N.C. at 53, 691 S.E.2d at 680. *See also Alexander v. Alexander*, 250 N.C. App. 511, 516-17, 792 S.E.2d 901, 905 (2016) (quoting *Id.* at 53-54, 691 S.E.2d at 680) (holding that, where the " 'unfairness of [Defendant's] conduct did not occur in his dealings with [other market participants]' " but rather only with the plaintiff, his co-owner, his conduct fell " 'entirely outside the purview of the [UDTPA].' ").

In the present case, unlike the plaintiff in *White*, plaintiff here is neither a partner nor has any ownership stake in Foxmoor Group, LLC ("Foxmoor"). Instead, plaintiff acted as an outside investor, and is therefore better viewed as a separate market participant. Moreover, though part of the repayment agreement for plaintiff's second loan included an agreement that Foxmoor would pay for her insurance as an

3

employee of the company, she was not an employee in any real sense of the term. Rather, as the agreement between the parties made clear, plaintiff was to be treated as an employee for health insurance purposes only, as part of the consideration for, and repayment of, her $75,000.00 loan. Because defendant did not "unfairly and deceptively interact[] only with his partners," *White*, 364 N.C. at 54, 691 S.E.2d at 680, or employee, I would hold that his conduct does not fall outside the scope of the UDTPA.

The majority argues that the present case is analogous to that of *HAJMM*. There, the plaintiff was an LLC engaged in agricultural marketing, and the defendant was an agricultural cooperative engaged in the business of processing turkeys and other poultry. 328 N.C. at 580, 403 S.E.2d at 485. The defendant was formed and partially capitalized with the plaintiff's sale of all of its stock in Raeford Turkey Farms, Inc. In consideration for the sale, the plaintiff received revolving fund certificates issued by the defendant which became part of the defendant's capital structure. *Id.* The defendant's bylaws specified that the certificates could be retired at the discretion of the board and "[f]unds arising from the issue of such certificates shall be used for creating a revolving fund for the purpose of building up such an amount of capital as may be deemed necessary by the board of directors from time to time and for revolving such capital." *Id.* at 581, 403 S.E.2d at 486. The plaintiff's certificate continued to be listed on the defendant's books as part of its capital

structure. When the plaintiff later demanded payment on the certificate, the defendant refused without good reason. *Id.*

Our Supreme Court, relying on its decision in *Skinner*, held the plaintiff was not entitled to recover under the UDTPA because corporate securities were outside the scope of the Act. *Id.* at 593, 403 S.E.2d at 492-93. In *Skinner*, that Court held that securities transactions are beyond the scope of the UDTPA. Specifically, it reasoned that it's holding

> is consistent with [N.C. Gen. Stat.] § 75-1.1's purpose to protect the consuming public, the North Carolina cases holding that other federal or state statutes may limit the scope of [N.C. Gen. Stat.] § 75-1.1, the absence of any other state court decision holding that securities transactions are subject to a similar Unfair Trade Practices Act, and the absence of any federal court decision holding that securities transactions are subject to § 5(a)(1) of the FTC Act. We do not believe that the North Carolina legislature would have intended [N.C. Gen. Stat.] § 75-1.1, with its treble damages provision, to apply to securities transactions which were already subject to pervasive and intricate regulation under the North Carolina Securities Act, N.C. Gen. Stat. § 78A-1 *et seq.* (1981), as well as the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1982), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1982). Furthermore, to hold that [N.C. Gen. Stat.] § 7-51.1 applies to securities transactions could subject those involved with securities transactions to overlapping supervision and enforcement by both the North Carolina Attorney General, who is charged with enforcing [N.C. Gen. Stat.] § 75-1.1, and the North Carolina Secretary of State, who is charged with enforcing the North Carolina Securities Act.

5

314 N.C. at 275, 333 S.E.2d at 241 (quoting *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 167-68 (1985)). Our Supreme Court in *HAJMM* thus further extended its holding in *Skinner* to include corporate securities, noting that "the legislature simply did not intend for the trade, issuance and redemption of corporate securities or similar financial instruments to be transactions 'in or affecting commerce' as those terms are used in N.C. [Gen. Stat.] § 75-1.1(a)." *Id.* at 594, 403 S.E.2d at 493. Because "revolving fund certificates are, in essence, corporate securities[,]" whose "purpose is to provide and maintain adequate capital for enterprises that issue them," the Court held that the plaintiff's claim did not fall under the purview of the UDTPA. *Id.* at 593, 403 S.E.2d at 493.

The majority asserts the same reasoning applies to the current case. However, there is a significant distinction between the two cases: *HAJMM* involved corporate securities, while the present case notably does not. While the plaintiff's claim in *HAJMM* fell outside the purview of the UDTPA precisely because it involved corporate securities, the same reasoning cannot apply here because no securities transactions or corporate securities are at issue. Rather, the present dispute arose due to nonpayment of a promissory note (along with certain other considerations), whose funds were misappropriated. Because, in my view, plaintiff, as an outside investor, was a separate market participant and her promissory note was not the

equivalent of a corporate security or similar instrument, I would affirm the judgment

of the trial court and hold that her claim does not fall outside the scope of the UDTPA.